IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SOFT PRETZEL FRANCHISE | : | |
| SYSTEMS, INC. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 13-3790 |
| TARALLI, INC, ET AL. | : | |

**SURRICK, J.**                                        **OCTOBER  4 , 2013**

<u>**MEMORANDUM**</u>

Presently before the Court is Plaintiff Soft Pretzel Franchise Systems, Inc.'s Complaint

for Preliminary Injunction and Motion for Preliminary Injunction (ECF No. 1, 2) and

Defendants' Opposition thereto.[1]  For the following reasons, Plaintiff's Motion will be granted.

## I.   PROCEDURAL HISTORY

On June 28, 2013, Plaintiff Soft Pretzel Franchise Systems, Inc. ("SPF") filed a Complaint

for Preliminary Injunction.  (ECF No. 1.)  On July 1, 2013 Plaintiff filed a motion requesting a

hearing on its request for preliminary injunction.  (ECF No. 2.)  On July 10, 2013, Thomas M.

Barron, Esquire accepted service of behalf of Defendants Taralli, Inc. (aka Taralli Enterprises, LLC),

Steven M. Pisasale, and Lisa A. Pisasale.  (ECF No. 4.)  As a result of a conference with counsel by

telephone, a hearing on Plaintiff's request for preliminary injunction was scheduled for July 24,

2013.  The preliminary injunction hearing was held as scheduled.  Plaintiff presented one witness,

Martin Ferrill, president of SPF.  Defendants presented testimony from John Heitmann, the owner of

an SPF franchise, and Defendant Steven Pisasale.  (ECF. No. 12.)  At the conclusion of the hearing,

---

[1] Defendants' Opposition was in the form of a Memorandum of Law that was not filed
with the Clerk of Court, and therefore is not on the Docket.  Rather, it was e-mailed to
Chambers.

the parties were directed to submit proposed findings of fact and conclusions of law within fourteen days of the hearing date.  (July 24, 2013 Hr'g Tr. 209, ECF No. 12.)  On August 6, 2013, Defendants filed a motion to dismiss for lack of subject matter jurisdiction.  (ECF No. 14.)  On August 7, 2013, Plaintiff filed its findings and conclusions as directed.  (ECF No. 15.)  On September 6, 2013, an order was entered denying Defendants' motion to dismiss.  (ECF No. 19.)  That same day, an order was entered directing Defendants to submit proposed findings of fact and conclusions of law no later than September 9, 2013.  (ECF No. 20.)  Defendants have disregarded the court order.  As of this date, no proposed findings of fact and conclusions of law have been filed.

Under Rule 55 of the Federal Rules of Civil Procedure, courts have authority to impose a default judgment against defendants for their failure to defend an action by refusing to comply with court orders.  *See Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 918 (1992); *see also Mendelsohn, Drucker, & Assocs. v. Titan Atlas Mfr., Inc.*, No. 12-0453, 2013 WL 1842124, at *4 -5 (E.D. Pa. May 2, 2013).  Despite having this authority, our ruling is based on the merits.  Courts also may adopt the findings proposed by a party.  *See Anderson v. City of Bessemer City,* 470 U.S. 564, 572 (1985) (the source of origin of the findings is of no moment if they are supported by the evidence of record).  Upon review of the testimony presented, evidence submitted, the parties' submissions, and the applicable law, and considering the fact that Defendants ignored this Court's orders and failed to submit counter findings and conclusions, we will adopt a number of Plaintiff's proposed findings, as set forth below.  These findings are clearly supported by the evidence and testimony presented at the hearing.

## II.   FINDINGS OF FACT

Based on the pleadings, the evidence and testimony offered at the hearing, and the full record, we make the following Findings of Fact.[2]

1.   Plaintiff SPF is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.  (Compl. ¶ 1, ECF No. 1.)

2.   Defendant Taralli, Inc. ("Taralli") is a New Jersey limited liability company with a business address in Marlton, New Jersey.  (*Id.* at ¶ 2.)

3.   Defendants, Steven M. Pisasale and Lisa A. Pisasale, are husband and wife and reside in New Jersey and are the sole owners and members of Taralli.  (*Id.* at ¶ 3.)

4.   SPF is the franchisor of retail businesses offering traditional "South Philadelphia" style soft pretzels freshly baked on the premises and other authorized products, using SPF's proprietary recipes, proprietary equipment and preparation, and presentation methods under the name Philly Pretzel Factory®.  (*Id.* at ¶ 7.)  SPF's franchisees are licensed to use SPF's trade names, trademarks, service marks and trade dress and are permitted to operate a business using SPF's business system and proprietary equipment.  (*Id.*)

5.   SPF currently has 124 franchises operating throughout the United States.  (Hr'g Tr. 76-78.)  Most of the franchises are concentrated in Pennsylvania, New Jersey, and Delaware.  (*Id.* at 76.)

6.   SPF's business model is a "snack concept," and most purchases made in an SPF franchise are impulse purchases.  (*Id.* at 44-45.)  Because most purchases are made on

---

[2] These Findings of Fact reflect our credibility determinations regarding the testimony and evidence presented.  Credibility determinations are within the sole province of the Court, as finder of fact.  Fed. R. Civ. P. 52; *see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982).

impulse, customers will not travel more than ten miles to purchase pretzels or other products offered by SPF franchises.  (*Id.*)

7.   It takes SPF upwards of two years to build a franchise location because SPF has to find a location, find a franchisee for the market, train the franchisee, build out the location, and create awareness in the market.  (*Id.* at 45-46.)

8.   On December 21, 2006, SPF and Defendants entered into a franchise agreement. (Franchise Agreement 25, Ex. P-1 (on file with Court); Hr'g Tr. 35, 153.)[3] Contemporaneous with Taralli's execution of the Franchise Agreement, the Pisasales executed a personal guaranty pursuant to which they agreed to guarantee Taralli's obligations under the Franchise Agreement.  (Franchise Agreement, Ex. B; Hr'g Tr. 36.)

9.   The Franchise Agreement contains an arbitration provision requiring all disputes and claims related to the Franchise Agreement be settled by arbitration.  (Franchise Agreement ¶ 16.2.3.)

10.  Pursuant to the Franchise Agreement, Defendants paid SPF $20,000 and agreed to pay SPF a royalty fee of six percent of weekly gross sales.  (Franchise Agreement ¶¶ 6.1, 6.2; Hr'g Tr. 38.)  In addition, Defendants agreed to operate a SPF franchise for ten (10) years in accordance with SPF's Standards of Operation, which required, among other things, that Defendants adhere to product and service quality standards, comply with operation and preparation methods, maintain, refurbish and modify store premises and equipment as needed and/or directed by SPF, and allow SPF to enter the

---

[3] At the hearing held on July 24, 2013, the parties submitted exhibits that were entered into evidence.  These exhibits are on file with the Court.

franchise premises to ensure Defendants' compliance with these standards. (Franchise Agreement ¶¶ 2.1, 8.6, 9.4.1, 9.5, 9.15, 9.16.)

11.     Defendants also agreed to purchase and install certain fixtures and equipment.  (*Id.* at ¶ 9.4.1.)  One piece of such equipment is the pretzel stringing machine, which is a machine that gives SPF's pretzel dough a unique consistency and texture exclusive to the SPF franchise.  (*Id.* at 46-47.)  These machines are made specifically for SPF and are available only to SPF franchisees.  (*Id.*)

12.     In exchange for Defendants' promises in the Franchise Agreement, SPF granted Defendants the right to operate a SPF franchise using the Philly Pretzel Factory trademark and goodwill.  (Hr'g Tr. 37.)  Defendants were also given the right to use confidential and proprietary information regarding the establishment and operation of an SPF store (the "System").  (Franchise Agreement ¶ 4; Hr'g Tr. 37.)  The confidential and proprietary information that comprises the System includes product preparation and assembly techniques, sales techniques, merchandising and display techniques and business and management practices.  (Franchise Agreement ¶ 4; *see* Hr'g Tr. 53-55.)  Defendants were fully trained on the SPF System during a one week SPF training class.  (Hr'g Tr. 50, 185.)

13.     The Franchise Agreement required that Defendants "use the Confidential Information only for the purposes and in the manner [SPF] authorize[s] in writing, which use will inure exclusively to [SPF's] benefit" and not disclose any Confidential Information in any manner other than as permitted by SPF in writing.  (Franchise Agreement ¶ 4.)

14.     The Franchise Agreement required that Defendants' "principals, employees and members of their immediate families who have access to [SPF's] Confidential

Information [] execute a noncompetition agreement containing provisions similar to those set forth [in the Franchise Agreement] as [SPF] in [its] sole discretion, prescribes."  (*Id.* at ¶ 10.5.4.)

15.    The Franchise Agreement further required that "any and all goodwill associated with the Proprietary Marks and [SPF's] copyrighted material, including goodwill that might be deemed to have arisen through [Defendants'] activities, inures directly to [SPF's] benefit."  (*Id.* at ¶ 3.1.)

16.    The Franchise Agreement provided that under certain conditions, SPF could unilaterally terminate the Franchise Agreement without notice to Defendants.  (*Id.* at ¶ 12.1.)  The Franchise Agreement also provided that, if Defendants failed to pay sums due to SPF, SPF's affiliates, or Defendants' suppliers, SPF could terminate the Franchise Agreement 15 days after giving Defendants written notice of monies owed. (*Id.* at ¶¶ 12.1.2, 12.1.2.1.)

17.    Upon termination, the Franchise Agreement provides that Defendants will cease their operations under the Franchise Agreement, cease use of the Confidential Information, and return the Operations Manual and all other manuals and Confidential Information loaned to Defendants.  (*Id.* at ¶ 13.1.)

18.    Also upon termination, the Franchise Agreement provides that SPF may purchase from Defendants "any equipment, including the pretzel stringing equipment, and any other personal property used in connection with operation of [Defendants'] Business by providing [Defendants] written notice of [SPF's] election within 15 days after such termination or expiration and paying [Defendants] the book value for such personal property within 60 days of such notice."  (*Id.* at ¶ 14.1.)  The Franchise Agreement

defines "book value" as "the amount you actually paid for the personal property less depreciation (calculated using the straight-line depreciation method on a ten year depreciation schedule irrespective of the depreciation method or schedule [Defendants'] use for accounting purposes)."  (*Id.*)  All SPF franchise agreements contain such an equipment buy-back provision, and SPF would not enter into a franchise agreement without an equipment buy-back provision.  (Hr'g Tr. 47-48.)

19.    Finally, the Franchise Agreement provides that, upon its termination, Defendants will adhere to the restrictions of a "non-competition" clause.  (Franchise Agreement at ¶¶ 10.5.2, 13.1.12.)  The relevant portion of the Franchise Agreement's non-compete clause states:

> 10.5. Non-Competition
>
> 10.5.2. After the Term of this Agreement. For a period of 2 years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither you, your principals, nor any member of the immediate family of you or your principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:
>
> 10.5.2.1. Own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other retail store, delivery service or other business similar to those offered under the System; (i) at the Factory; (ii) within the Territory; or (iii) within a radius of 10 miles of (a) the perimeter of the Territory being granted hereunder or (b) any other Soft Pretzel Factory Territory licensed by us as of the date of expiration or termination of this Agreement; or
>
> 10.5.2.2. Solicit business from customers of your former Soft Pretzel Factory or contact any of our suppliers for any competitive business purpose nor solicit any of our employees, our affiliate or any other System franchisee to discontinue employment;

(Franchise Agreement ¶ 10.5.2.)  All SPF franchise agreements contain a non-compete clause, and SPF would not enter into a franchise agreement without a non-compete clause.  (Hr'g Tr. 47-48.)

20.     SPF alleges that Defendants have been in default of the Franchise Agreement on an ongoing basis since December 6, 2007.  (Ex. P-2 (on file with Court); Hr'g Tr. 34-35, 56-57.)

21.     On January 11, 2013, Defendants were in default of the Franchise Agreement. Defendants did not always pay franchise royalties on a weekly basis, as required by the Franchise Agreement.  (Hr'g Tr. 173-74.)  Defendants also further violated the Franchise Agreement by not accepting credit cards (*id.* at 192-93), and not offering pepperoni pretzel melts (*id.* at 191-92).

22.     On January 11, 2013, the president of SPF, Martin Ferrill, directed SPF's counsel to send Defendants a Notice of Default, in which SPF alleged that Defendants were in default of the Franchise Agreement for:

        a.   Failing to operate the Franchise Business in compliance with SPF standards and specifications in violation of Paragraph 9.4.1 of the Franchise Agreement;

        b.   Failing to report gross sales and pay royalties and advertising payment due under the Franchise Agreement for the weeks ending December 9, 2012, through the date of the letter in violation of Paragraph 6.2 of the Franchise Agreement;

c.   Failing to pay Invoice No. LG 021811 dated February 4, 2011, in the amount of $1,456.71 in violation of Paragraph 12.1.2.1 of the Franchise Agreement;

d.   Failing to use the required credit card terminal and refusing to accept credit cards from customers of the Franchised Business in violation Paragraphs 9.4.1, 9.7 and 9.10 of the Franchise Agreement;

e.   Failing to use the required cheese pump which ensures that the proprietary cheese maintains the required serving temperature of 140° in violation of Paragraphs 9.4.1 and 9.10.2 of the Franchise Agreement;

f.   Failing to have its employees wear the required Philly Pretzel Factory uniform in violation of Paragraph 9.6 of the Franchise Agreement; and

g.   Failing to offer the Pepperoni Pretzel Melts in violation of Paragraph 9.5 of the Franchise Agreement.

(Notice of Default Ex. P-3 (on file with Court); Franchise Agreement; Hr'g Tr. 57-58, 66-68.)

23.   SPF gave Defendants fifteen days to cure the monetary defaults.  (Notice of Default; Hr'g Tr. 67-68.)  SPF further notified Defendants that if they failed to cure their defaults within the time prescribed, SPF would terminate Defendants' franchise effective 60 days from the date they received the Notice of Default.  (Notice of Default.)  Defendants failed to cure all defaults in the prescribed time, although

Defendants do claim they paid SPF all monies owed within 60 days of the Notice of Default.  (Hr'g Tr. 168-169.)

24.    On February 4, 2013, SPF sent Defendants a Notice of Termination, in which SPF notified Defendants of the termination of their franchise due to Defendants' failure to cure their monetary defaults, i.e. submit gross sales reports and royalties and advertising payments for the weeks ending January 6, 2013, January 13, 2013, January 20, 2013, and January 27, 2013, or pay invoice no. LG 021811 dated February 4, 2011, in the amount of $1,456.71, within fifteen days as required in Paragraph 12.1.2 of the Franchise Agreement.  (Notice of Termination, Ex. P-4 (on file with Court); Hr'g Tr. 68.)  The Notice of Termination further notified Defendants that their franchise would terminate on March 17, 2013.  (Notice of Termination.)  Finally, the Notice of Termination informed Defendants of SPF's expectation that Defendants will comply with the post-termination obligations contained in the Franchise Agreement.  (*Id.*)

25.    After Defendants failed to cure the monetary defaults within fifteen days, the franchise was terminated as of June 14, 2014.[4]

26.    On June 12, 2013, SPF, through its attorney, notified Defendants that SPF intends to enforce the post-termination non-compete provision contained in Paragraph 10.5.2 of the Franchise Agreement and is exercising its right to purchase Defendants'

---

[4] On February 8, 2013, Taralli and the Pisasales filed a verified complaint in the New Jersey Superior Court's Chancery Division against SPF to enjoin SPF from terminating Defendants' Franchise.  (Compl. ¶ 13).  On March 12, 2013, Judge Suter of the Superior Court of New Jersey Chancery Division imposed temporary restraints, thereby staying the March 17, 2013, termination of Defendants' franchise.  (Hr'g Tr. 6-7.)  On May 31, 2013, Judge Suter dissolved the temporary restraints as of June 14, 2013, thus rendering Defendants' franchise terminated as of June 14, 2013.  (Op. of Judge Suter, Ex. P-5.)

equipment pursuant to Paragraph 14.1 of the Franchise Agreement.  (Ex. P-8 (on file with Court); Hr'g Tr. 71-72.)

27.   The same day, counsel for Defendants responded that Defendants intend "to operate as a retail store not affiliated with Soft Pretzel Franchise Systems, Inc." and "will not be selling its equipment to [SPF]."  (Ex. P-9 (on file with Court); Hr'g Tr. 72.) Defendants still possess SPF's pretzel stringing equipment.

28.   Immediately after Defendants ceased operating their SPF franchise on June 14, 2013, they began operating a similar business at the same location and using the same equipment under the name Marlton Soft Pretzel.  (Hr'g Tr. 72, 198.)  Defendants no longer use the SPF name or signage.  (*Id.* at 181.)  Still, Marlton Soft Pretzel currently sells soft pretzels, in addition to water ice and a cinnamon bakery product.  (*Id.* at 182, 183.)  Marlton Soft Pretzel anticipates further expanding its offerings into ice cream and funnel cakes.  (*Id.*)

29.   SPF alleges that Defendants' continued sale of pretzels at the same location where they operated their SPF franchise violates the non-compete provisions contained in paragraph 10.5.2 of the Franchise Agreement.[5]  SPF further alleges that Defendants' refusal to sell SPF the pretzel-stringing machines violates the equipment buy-back

---

[5] In their Memorandum of Law in Opposition to SPF's Motion for Preliminary Injunction, Defendants claim that SPF must be judicially estopped from representing to this Court that Defendants cannot operate a pretzel store, because SPF previously represented to the Superior Court of New Jersey that there was no contractual bar preventing Defendants from operating as an independent pretzel factory.  (Defs.' Opp'n 8-10.)  We do not view SPF's statement in the New Jersey Court as inconsistent with the position it is currently taking:  SPF is not currently asserting that Defendants may not operate any pretzel store, but that Defendants may not operate an independent pretzel store in the area proscribed by the non-competition clause in the Franchise Agreement for two years from the termination of Defendants' franchise. Accordingly, judicial estoppel is not appropriate here.

provision of the Franchise Agreement contained in Paragraph 14.1 of the Franchise Agreement.

## III.   CONCLUSIONS OF LAW

1.      We have subject matter jurisdiction over this action under 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there exists complete diversity of citizenship between Plaintiff, a citizen of Pennsylvania, and Defendants, citizens of New Jersey.  (Court's Mem., ECF No. 18.)

2.      In determining whether to issue a preliminary injunction, a court must consider four factors:  "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest."  *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356–57 (3d Cir. 2007)).  "'[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court' should look to factors three and four when relevant."  *PB Brands, LLC v. Patel Shah Indian Grocery*, No. 07-4394, 2008 WL 2622846, at *2 (E.D. Pa. June 6, 2008) (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)).  Granting preliminary injunctive relief is an "extraordinary remedy," *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988), and "[a]ll four factors should favor preliminary relief before the injunction will issue," *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).

A.      **Probability of Success on the Merits**

1.      *Termination*

3.      The New Jersey Franchise Practices Act ("NJFPA") N.J.Stat. Ann. §§ 56, *et seq*.

requires that written notice setting forth all the reasons for termination of a franchise

be sent to the franchisee at least 60 days in advance of termination. [6] N.J.Stat. Ann. §

56:10-5 (West 2013).  NJFPA also provides that a franchisor cannot terminate a

franchise without "good cause" and describes "good cause" as "failure by the

franchisee to substantially comply with those requirements imposed upon him by the

franchise." *Id.*  Substantial compliance is something less than absolute adherence to

every nuanced term of an agreement that—"at a minimum—requires that the

franchisee refrain from acting in direct defiance of a term of the franchise

agreement." *GMC v. New A.C. Chevrolet, Inc.*, 91 F. Supp. 2d 733, 740 (D.N.J.

2000).  This is especially true when the franchisee has received specific notice from

the franchisor that its behavior is a violation of the agreement. *Id.*; *see also Dunkin'*

*Donuts v. Middleton Donut Corp.,* 495 A.2d 66, 68-69, 72 (N.J. 1985) (upholding

trial courts' finding that franchisee's deliberate underreporting of sales "amounted to

substantial non-compliance with his franchising responsibilities so that good cause for

termination existed").

4.      As stated in our Findings of Fact, SPF, through counsel, served Defendants with the

Notice of Default on January 11, 2013, which notified Defendants that their franchise

would be terminated within 60 days if they failed to cure the identified defaults within

---

[6] In its June 24, 2013, decision regarding Defendants' motion for a preliminary
injunction, the Superior Court of New Jersey concluded that Defendants are protected by the
NJFPA.  (Ex. P-5 11.)

the time prescribed.  (Notice of Default.)  Defendants failed to cure the monetary

defaults within 15 days, as required by Paragraph 12.1.2.1 of the Franchise

Agreement, so SPF, again through counsel, served Defendants with the Notice of

Termination on February 4, 2013, notifying Defendants that their franchise would

terminate on March 17, 2013.  (Hr'g Tr. 68; Notice of Termination.)

5.     SPF first notified Defendants of the termination on January 11, 2013.  Then, on

February 4, 2013, SPF further notified Defendants that the franchise would terminate

on March 17, 2013, which was more than 60 days after Defendants first received

notice of termination.[7]  Accordingly, SPF provided notice of termination in

accordance with § 56:10-5 of the NJFPA.  *See generally Maple Shade Motor Corp. v.*

*Kia Motors of Am., Inc.*, 384 F. Supp. 2d 770,773 (D.N.J. 2005); *Goldsworthy v.*

*Browndorf*, No. L-2177-04, 2011 WL 3687401, at *4 (N.J. Super. Ct. App. Div. Aug.

24, 2011).

6.     Defendants claim SPF cannot establish a likelihood of success on the merits because

SPF did not have good cause to terminate Defendants' franchise.  (Defs.' Opp'n 12.)

Defendants are incorrect.  The evidence presented by SPF establishes that SPF likely

did have good cause for terminating Defendants' franchise.  SPF presented evidence

that it terminated Defendants' franchise because Defendants were not in compliance

with the Franchise Agreement.  Specifically, Defendants had not paid amounts

obviously due under the Franchise Agreement including royalties, and Defendants

were not operating the franchise in accordance with the Franchise Agreement by not

---

[7] The franchise was not terminated on March 17, 2013 because the Superior Court of
New Jersey imposed a temporary restraint staying the termination of Defendants' franchise.
(Op. of Judge Suter 1.)  The franchise was officially terminated on June 14, 2014, after the
temporary restraint was removed.  (*Id.*)

14

accepting credit cards and not selling pretzel melts.  Defendants did not present

evidence that they cured their monetary defaults within 15 days, as required by

Paragraph 12.1.2 of the Franchise Agreement.  Defendants also presented no credible

evidence to suggest they had cured all other defaults that SPF brought to their

attention within 60 days of the Notice of Default.  Because SPF can establish that

Defendants were not acting in accordance with various terms of the Franchise

Agreement, there is sufficient evidence to conclude that SPF will likely be successful

in establishing that it terminated Defendants' franchise for good cause under NJFPA.

> 2.    *Non-Compete Provision*

7.    Under Pennsylvania law,[8] for a covenant not to compete to be enforceable, it must

satisfy three requirements:  "(1) the covenant must relate to either a contract for the

sale of goodwill or other subject property or to a contract for employment; (2) the

covenant must be supported by adequate consideration; and (3) the application of the

covenant must be reasonably limited in both time and territory."  *Piercing Pagoda,*

*Inc. v. Hoffner*, 351 A.2d 207, 210 (Pa. 1976); *see also Maaco Franchising, Inc. v.*

*Augustin*, No. 09–4548, 2010 WL 1644278, at *3 (E.D. Pa. Apr. 20, 2010) (applying

Pennsylvania law to covenant not to compete).

8.    Neither party disputes that the first two requirements are fulfilled.  First, the covenant

is ancillary to the sale of a legitimate business interest–an SPF franchise.  *Piercing*

*Pagoda*, 351 A.2d at 212 (holding that an existing franchise is a legitimate business

interest that can be protected by a covenant not to compete); *see also Athlete's Foot*

*Mktg. Assocs. v. Zell Inv., Inc.*, No. 00-186, 2000 WL 426186, at *9-10 (W.D. Pa.

---

[8] Neither party has challenged the Franchise Agreement's choice-of-law provision that
requires the application of Pennsylvania law.  (Franchise Agreement ¶ 16.2.1.)

Feb. 17, 2000) ("A franchisor [] has a protectable interest in the sale of its franchises such that a reasonable covenant-not-to-compete effective upon the termination of the franchise is enforceable.").  Second, the sale was supported by adequate consideration:  the covenant was entered into as a condition of the franchise relationship.  Also, in exchange for Defendants' promise not to compete, SPF gave Defendants access to SPF's trademark, unique method of conducting business, reputation, and goodwill.  *See Athlete's Foot,* 2000 WL 426186, at *10.

9.      Defendants similarly do not dispute the third requirement, that the covenant be reasonably limited in both time and territory.  The time duration contained in Paragraph 10.5.2 of the Franchise Agreement is two years.  The geographic scope of the restrictive covenant is limited to the location of Defendants' former franchise, within the former franchise territory, or ten miles from the perimeter of Defendants' former territory or the territory of any other SPF franchisee.  (Franchise Agreement ¶ 10.5.2.1.)

10.     Under Pennsylvania law, a covenant not to compete in a franchise agreement will be equitably enforced when the restrictions are reasonably necessary for the protection of the franchisor and reasonably limited as to duration of time and geographical extent.  *Piercing Pagoda*, 351 A.2d at 212-13.  Here, a two-year restriction on Defendants' ability to compete is reasonable.  Two years gives SPF enough time to adequately protect its business interest, as it could take SPF up to two years to establish a new franchise in the area where Defendants' franchise was located. Furthermore, covenants containing similar, or longer, time restrictions on a franchisee's ability to compete have been held reasonable.  *See Rita's Water Ice*

*Franchise Co., LLC v. S.A. Smith Enters., LLC*, No. 10-4297, 2011 WL 101694, at *7 (E.D. Pa. Jan. 11, 2011) (finding two-year restriction on franchisee's ability to compete reasonable); *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 128 (M.D. Pa. 1992) (finding the two-year time duration on the restrictive covenant at issue was reasonable as it was necessary to allow the franchisor "to seek, train, and bring up to speed replacement franchises"); *Piercing Pagoda*, 351 A.2d at 210-13 (enforcing three-year restriction on franchisee's ability to compete).

11.   The ten-mile geographic extent of the covenant not to compete is also reasonable under Pennsylvania law.  *See Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC*, 918 F. Supp. 2d 407, 415 n.7 (E.D. Pa. 2013) (ten mile radius reasonable); *Maaco Enters., Inc. v. Bremner*, No. 98-2727, 1998 WL 669936, at *3 (E.D. Pa. Sept. 29, 1998) (ten mile radius reasonable); *Piercing Pagoda*, 351 A.2d at 212 (thirty mile radius reasonable).  Ten miles is the approximate distance a customer is willing to travel for SPF's products and is thus a reasonable geographic limit on Defendants' ability to compete.

12.   The covenant not to compete in the Franchise Agreement is reasonably limited in scope and duration, and is thus enforceable under Pennsylvania law.

13.   Defendants are currently violating the covenant by operating a business similar to SPF's in the same location where Defendants previously operated an SPF franchise. Although Defendants changed the name of the business to "Marlton Soft Pretzel" and have expanded their product offerings beyond what is offered at an SPF franchise, Defendants are still operating a business that is similar to SPF's business because they are still primarily selling pretzels.  This is a direct violation of the non-

competition provision in the Franchise Agreement.  Moreover, Defendants are still

making pretzels as if they were an SPF franchise:  using SPF's proprietary pretzel

stringing machine and SPF's recipes.  Based on these reasons, we find that SPF has

demonstrated a reasonable probability of succeeding on its claim that Defendants

have violated the non-competition provision in the Franchise Agreement.

3.    *The Equipment Buy-Back Provision*[9]

14.    "The general rule in Pennsylvania, as elsewhere, is that courts are required to give

effect to the language of contracts, including insurance policies, if that language is

clear and unambiguous."  *Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 136 (3d Cir.

2005).

15.    Paragraph 14.1 of the Franchise Agreement provides SPF with an option to purchase

the equipment, including the proprietary pretzel stringing equipment, of a terminated

franchise if notice of SPF's election to purchase the equipment is provided within 15

days of such termination.  (Franchise Agreement ¶ 14.1.)  The provision further

provides a formula for calculating the purchase price.  (*Id.*)  Defendants do not

dispute the enforceability of Paragraph 14.1 of the Franchise Agreement.

16.    Courts interpret and enforce contracts as written and cannot write into them terms not

contained therein.  *Sentry Safety Control Corp. v. Jaybee Amusement Co.*, 169 A.

419, 422 (Pa. Super. Ct. 1933).  This Court concludes that Paragraph 14.1 of the

Franchise Agreement is clear and unambiguous and should be enforced as written.

17.    Defendants' franchise was terminated on June 14, 2013, and SPF timely exercised its

option to purchase the proprietary pretzel stringing equipment as set forth in the

---

[9] The equipment buy-back provision contained in Paragraph 14.1 of the Franchise Agreement is also subject to Pennsylvania law.  (Franchise Agreement ¶ 16.2.1.)

Franchise Agreement on June 12, 2013.  (Ex. P-5; Ex. P-8.)  Defendants have refused

to sell the pretzel stringing equipment to SPF.  (Ex. P-9.)  Accordingly, SPF has

established that it has a reasonable probability of succeeding on its claim that

Defendants are violating the equipment buy-back provision of the Franchise

Agreement.

**B.      Irreparable Harm if the Relief Sought is Not Granted**

18.      We have concluded that SPF has sufficiently demonstrated that Defendants have

violated the non-competition clause in the Franchise Agreement and the equipment

buy-back provision of the Franchise Agreement so as to satisfy the "likelihood of

success on the merits" prong of the preliminary injunction standard.  We therefore

must determine the extent of irreparable harm SPF will face if Defendants are

permitted to continue violating those provisions of the Franchise Agreement until this

matter is resolved in arbitration.  Defendants claim SPF faces no irreparable harm

because Defendants have stopped using SPF's name and vestiges.  (Defs.' Opp'n 12.)

19.      "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk

that he or she will experience harm that cannot adequately be compensated after the

fact by monetary damages."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85

(3d Cir. 2000).  This is a heavy burden.  *Id.*  Monetary loss alone is insufficient to

show irreparable harm.  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d

553, 557 (3d Cir. 2009).  "Grounds for irreparable injury include loss of control of

reputation, loss of trade, and loss of goodwill."  *Pappan Enters., Inc. v. Hardee's*

*Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).

20.    "Irreparable injury results when a former franchisee competes against a franchisor in breach of a restrictive covenant contained in the parties' franchise agreement." *Smith Enters.*, 2011 WL 101694, at *8 (quoting *Athlete's Foot*, 2000 WL 426186, at * 11). A franchisor has an interest in retaining an established customer base in an area where it has established a franchise location. *Id.* The franchisor has an interest in capitalizing on its established goodwill by placing a new franchise in the area as soon as possible. *Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, No. 96-306, 1996 WL 165518, at *4 (E.D. Pa. Apr. 8, 1996).

21.    A franchisor's business reputation is irreparably harmed when a former franchisee continues to operate at a franchise location after the expiration of a franchise agreement in violation of a non-compete clause. *Athlete's Foot*, 2000 WL 426186, at *11–12 ("The covenant-not-to-compete set forth in the Operating Agreement is designed to prevent not only sales that might result from the prohibited competition, but primarily to prevent a disturbance in the relationship between [franchisor] and its customer base, and the goodwill developed for the stores operated by [franchisor] and its authorized franchisees . . .. The consequences of this disturbance with customer relationships is unascertainable and not capable of being fully compensated by money damages."); *see Novus Franchising*, 795 F.Supp. at 130.

22.    Pursuant to Paragraph 3.1 of the Franchise Agreement, Defendants agreed that "any and all goodwill associated with the Proprietary Marks and [SPF's] copyrighted material, including goodwill that might be deemed to have arisen through [Defendants'] activities, inures directly to [SPF's] benefit." (Franchise Agreement.)

23.     Here, SPF is irreparably harmed by Defendants' operation of a competing business, Marlton Soft Pretzel, in violation of the non-compete clause contained in the Franchise Agreement.  The purpose of the Franchise Agreement restrictive covenant is to protect SPF against loss of reputation, damage to its goodwill, and customer confusion, which may result should defendants compete with SPF after the termination of the Franchise Agreement.  Despite Defendants contention otherwise, Defendants, as a franchisee, did gain valuable training, knowledge, and experience from SPF.  To permit Defendants to use this knowledge and experience to continue to operate a competing business that serves SPF's former and potential customers, even one under a different name with a different color scheme, would irreparably harm SPF's goodwill and its ability to effectively compete in Defendant's territory.  "Although some of [SPF's] damages . . .  may be measurable in monetary terms, others—such as [loss of] goodwill, are too nebulous to ascertain."  *Novus Franchising*, 795 F. Supp. at 131.

24.     SPF is also harmed by Defendants' continued use of SPF's proprietary pretzel stringing equipment, despite SPF's exercise of its option to buy-back the equipment.  Similar to the damages that SPF will suffer in connection with a violation of the non-compete, SPF will suffer a loss of reputation, damage to its goodwill and customer confusion.  Further, SPF will suffer the loss of its unique methodology for making soft pretzels by Defendants' retention of the proprietary pretzel stringing machine.

25.     The pretzel stringing machine was sold to Defendants in connection with the operation of an SPF franchise.  The equipment is proprietary and permits the creation of SPF soft pretzels which are distinctive on the market.  Only SPF franchisees may

21

use this piece of equipment.  If Defendants are permitted to retain possession of the pretzel stinging machine and continue selling pretzels made using this machine, SPF's pretzels will no longer be unique.  This loss of uniqueness will impair SPF's ability to sell future franchises and may result in loss of market share, inability to sell Defendants' former franchise territory, customer confusion, and loss of reputation and goodwill. These damages cannot be recovered through monetary damages, nor can they be recovered or redressed once lost.

26.     All SPF franchisees have non-compete and equipment buy-back provisions in their franchise agreements with SPF, and SPF would not enter into a franchise agreement without those provisions.  If SPF is unable to enforce the non-compete and equipment buy-back provisions contained in the Franchise Agreement, the values of all of its franchises are lowered.  *DBI Inv. Corp.*, 1996 WL 165518, at *5.  Furthermore, other franchisees with similar provisions may be encouraged to violate their franchise agreements, just as Defendants have, and use SPF's goodwill to establish competing businesses.  *See id.*

27.     In light of the foregoing, the Court finds that SPF will suffer irreparable harm if the relief sought is not granted, favoring the granting of a preliminary injunction.

### C.     Harm to SPF Outweighs Possible Harm to Defendants

28.     The Court finds that the harm to SPF that will result if Defendants are not enjoined from operating a competing business and compelled to sell SPF the proprietary pretzel stringing equipment outweighs any harm to Defendants.

29.     Defendants were aware of any potential harm when they signed the Franchise Agreement and then opened a competing shop following the termination of the

Franchise Agreement, in violation of Paragraphs 10.5.2 and 14.1 of the Franchise

Agreement. *Augusti*, 2010 WL 1644278, at *4; *see also DBI Inv. Corp.*, 1996 WL

165518, at *5 (finding harm that defendants who violated franchise agreement faced

"is of their own making").

30. While Defendants may suffer monetary harm from lost revenues as a result of the

enforcement of the restrictive covenant and equipment buy-back provisions, their

self-inflicted harm is outweighed by the irreparable harm SPF will suffer should an

injunction not be issued.  In addition, Defendants' potential losses are further

mitigated because they are not precluded from selling products that do not violate the

non-competition provision, such as water ice, which Defendants currently sell. *See*

*Tantopia Franchising Co.*, 918 F. Supp. 2d at 420.

31. Accordingly, this factor favors a grant of preliminary injunctive relief.

### D.    The Public Interest

32. "[T]he public interest is served by fulfilling the contractual interests of the parties and

maintaining the viability of franchise systems." *Augusti*, 2010 WL 1644278, at *4;

*see also DBI Inv. Corp.*, 1996 WL 165518, at *5 ("[T]he public interest supports

contractual enforcement by preventing competition in violation of a valid restrictive

covenant."); *Novus Franchising*, 795 F. Supp. at 132 ("High courts in Pennsylvania . .

. have determined . . . that protecting the interests in goodwill of employers and

franchisors as embodied in non-competition clauses outweighs [the argument that

restrictive covenants restrict freedom of competition].").

33.     Here, the public interest is served by enforcing, through the issuance of a preliminary injunction, the non-competition and equipment buy-back provision of the Franchise Agreement, so as to maintain the viability of SPF's franchise.

   **E.     Injunction Bond**

34.     Defendants gave no testimony regarding the bond amount.  In accordance with Rule 65(c), the Court will require SPF to post an injunction bond in the amount of $20,000 This amount is required to cover damages Defendants may suffer if they have been wrongfully enjoined.

## IV.     CONCLUSION

35.     Based upon the foregoing Findings of Fact, we are satisfied that a preliminary injunction is appropriate here.

Accordingly, SPF's Motion for Preliminary Injunction will be granted pending a decision or award pursuant to arbitration in accordance with the terms of the Franchise Agreement.

An appropriate order follows.

                                        **BY THE COURT:**

                                        _____

                                        **R. BARCLAY SURRICK, J.**